Good morning, Your Honors. Good morning. Mark Lipton appearing for the Appellant Plaintiff, Deborah Carter. I'd like to reserve five minutes, Your Honors, and I'd also like to apologize to the Court and to opposing counsel. In reviewing my briefs yesterday, I realized there were some typographical errors and some grammatical irregularities, and I apologize to the Court and opposing counsel for those being there. There weren't many, but there shouldn't be any. I'd like to start back one step from the prior case, and maybe I'm totally out to lunch on this, but I think in light of Burt and Banuelos, those two cases, that the question of discretion, the absence of any grant of discretion in the summary plan description, which is the primary, if not singular, document that the participants in reality receive, that discretion should not be available to Hewlett-Packard. There is no dispute that there is no reservation, no grant of discretion of any sort in the summary plan description. The summary plan description goes in some detail as to a definition of objective evidence that needs to be presented, and the limitation we just talked about, I heard you folks talking about regarding the psychological ailments, that the administrator will make the determination. There's a fair amount of discussion in the summary plan description on what you need to do to perfect the claim. No mention is made of a grant of discretion or how that would affect a decision maker. To say that silence in the plan, the SPD, excuse me, is not contradictory to what the plan says ignores realities. By the plan, the SPD remaining silent on discretion, no notice is given to the participant of the burden they may have in trying to perfect the claim. If they have that notice, many of them could look elsewhere for a group plan, either through a professional association or a hobby group they belong to, that actually does not have that grant of discretion in it. So with the grant of discretion being so important, as you well know from these cases that come before you, for the summary plan description to be as important as both Banuelos and Berg says it is, for that grant not to be in the summary plan description and allow it to be in the plan document, which basically most participants never see, I think is unreasonable  It's an easy matter to put it in the summary plan description. And if it's not there, I don't think there should be discretion. Assuming the Court disagrees with me and says, no, there is discretion and that's the standard we're going to use, I'd like to go on to talk about the initial denial. The initial denial in this matter was on 91623. Excuse me, it was 91603, and it's pages 38 and 39 of the original administrative record that was filed. That denial makes no analysis at all of the interstitial cystitis and irritable bowel syndrome that the plaintiff had, that the appellant had. No analysis at all by VPA was done of those ailments. Instead, it mentioned she had the ailments. It did not reference the multiple pages that Dr. Snyder submitted. It mentioned excerpts from them, but not the entire limitations that he placed on her, which included the 15-minute, every-hour frequent bathroom breaks, and instead jumped into the following paragraph stating that fibromyalgia and mental disorders are limited to 52 weeks. I think it's important, Your Honors, to understand that Black and Decker v. Nord, while it eliminated the social security test for treating physician, that is, it didn't heighten a treating physician's opinion to being paramount over other physicians, consulting physicians and reviewing physicians. And I'm sure you're aware, being U.S. Attorney, with all the social security cases, the Court in that case at page 834 did say to arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician, is impermissible. Now, you look at the initial denial, and there is no doctor who was involved in that analysis, that initial denial. The doctor came in, Dr. Weingarten, the second time around on the final denial, which was not subject to appeal. So the initial denial had no doctor analyzing it, and it disregarded Dr. Snyder's findings after Dr. Snyder was sent a bladder functional capacity form by the VPA. They have a special form for bladder functions and the limitations that result. He filled it out in detail and sent it back. It's not even commented on in the letter, in the denial letter, the first letter that went out. So clearly, the treating physician from the outset, without any credible reason, was disregarded. I think that that was inappropriate. And then ultimately, in the final denial by Dr. Weingarten, the issue of the treating physician, again, was not considered at all. Merely Dr. Weingarten did not agree with the diagnosis. He was not convinced that there was interstitial cystitis that was causing the cyst that Dr. Snyder used to confirm it. After Black and Decker, it is appropriate for a plan administrator to look at the evidence presented by a treating physician and then evidence presented by a reviewing but non-treating physician and conclude to rely upon the reviewing non-treating physician's opinion, even if it differs from the treating physician. Absolutely. Correct. Absolutely. There was not even a non-reviewing physician that looked at Dr. Snyder's opinion on the first denial. There was no physician that reviewed the case initially when that first denial came out in September 16th of 2003. The first time a physician reviewed the file was thereafter when Dr. Weingarten got it on the appeal that was made. So we start with abusive discretion. I think we see a pattern forming here. Additionally — Are we in a position of reviewing the decision as appealed, or are we reviewing the initial denial? You're reviewing it as appealed. I'm not going to say that you're only reviewing the initial denial, but we go to the Dr. Weingarten, we have two issues with Dr. Weingarten. One is, was he considering all the evidence that could be considered? Because objective evidence in the plan was not defined the same way as objective evidence was defined to Dr. Weingarten. He was given a form to fill out which said objective evidence means clinical findings, and the plan has a different definition of objective evidence. It talks about findings that aren't distorted by passion and interpretations, et cetera. It's not as tight and limited as clinical finding definition that Dr. Weingarten was given. So first of all, his review was under a standard that was different than was in the  Secondly, he concluded that the plaintiff, the appellant, needed frequent bathroom breaks. As Dr. Snyder concluded, she needed frequent bathroom breaks. During flare-ups, didn't he say that? No. He just said she needed to check the box. He said you wrote in frequent bathroom breaks. On the form he had, there were three doctors. Dr. Snyder was the main doctor who treated the appellant for years, and he filled out the bladder functional form, et cetera. He retired. I asked the replacement doctor for an update, Dr. Alvarado. Dr. Alvarado, I sent him a letter outlining what Dr. Snyder had said, bringing him up to date, having looked at the file. And he said, I said, do you agree with this? And does she need even more than 15 minute per hour breaks when she has flare-ups? And he responded to that, yes. During flare-ups, she will need even more. And to take that out of context from my letter that I wrote him, that's not a fair analysis. The final point I'd like to make is regarding the mental nervous disorder. I heard opposing counsel comment that this plan is different than the plan in Koonin and Patterson because this plan has a definition of what a psychiatric or mental nervous disorder is. I agree. It does. But that definition specifically, as detailed as it is, and because it is detailed, does not cover a pain disorder. It specifically says that the manifestation must be behavioral or a mental impairment. The manifestation of the psychological order must be behavioral or mental impairment, not physical. And that was the whole point of Patterson and Koonin, that if you don't put in your plan, and this is in the plan and the SPD, if you don't put in those documents that a mental disorder that causes you pain, physical pain, is excluded, it's not going to be excluded. And so, yes, they defined it, but they didn't define mental disorders including a pain disorder. Dr. Weingarten says she has a physio-psychological pain disorder, somatization. So he agrees that she has the pain. He says it's not interstitial cystitis, it's probably somatization, or it could be part of the side effects of medication. He wasn't sure, but he says she has a pain disorder. And there is no exclusion in the plan for pain disorders. Dr. Snyder says it's from interstitial cystitis. Everybody agrees that there's going to be frequent bathroom breaks. No analysis was done on the vocational impact of the frequent bathroom breaks. And it becomes quite clear, even though the Court below said if she has to take these frequent bathroom breaks, the Court couldn't figure out how she could work. She just didn't understand the illness. So those are the issues, I think, before the Court in this case. Are there any questions? I don't see any. You have a little bit of some time left for rebuttal if you choose to use it. That's what I'm going to use it for, Your Honors. Thank you. Thank you very much for your argument. Counsel? Different colored papers for this one. May it please the Court. This is the second of three cases to be heard today involving the income protection plan. There are two issues. Did the failure of the summary plan description to include within it a description of VPA's grant of discretion mean that the de novo standard of review should have been applied by the District Court? Secondly, did Judge Wilkins commit clear error in concluding that VPA did not abuse its discretion in denying plaintiffs' claim for long-term disability benefits? Now, in terms of Judge Wilkins' decision to apply the de novo --- excuse me, the arbitrary and capricious standard of review, this Court reviews that de novo. In this case, Judge Wilkins conducted a Rule 52 bench trial. And so the standards that govern factual findings in a bench trial would apply to her factual findings in this case. There's no question that there was no prejudice to Ms. Wright. The parties did agree prior to the case management conference that there would be an exchange of joint motions for summary judgment. Judge Wilkins disagreed at the case management conference and at that time ordered that instead of cross motions for summary judgment, she would conduct a bench trial and instructed the parties to provide briefs and evidence. So let's look at the first issue, the application of the arbitrary and capricious standard. No court in any jurisdiction has ever held that the summary plan description must contain the standard for the administrator's exercise of discretion. In fact, every court that has considered the issue has rejected it. That's the First Circuit in the Fenton case. That's the Fourth Circuit in the Martin case. That's the Eighth Circuit in the Wald case. And that's this Court in the Atwood case. I did not cite the Atwood case for that proposition in my brief on that issue. I cited it for a different issue in terms of whether or not there was a conflict of interest that would give rise to a de novo standard of review. But this Court specifically in Atwood addressed whether or not it would be required, and that's found at 1321 and 1322 of the Court's opinion. In relevant part, the Court held Atwood's next argument in favor of de novo review is that Newmont's summary plan description does not state that Newmont has discretion in this situation and that the SBD should control. We disagree. This is not a situation where the SBD failed to describe accurately the circumstances or actions which could affect an employee's eligibility for benefits. As counsel acknowledged, the summary plan description laid out the definition of objective medical evidence. It laid out the standards and the exclusions to the mental illness. Continuing, the Court said, ERISA requires that the SBD explain the circumstances which may result in disqualification and eligibility or denial or loss of benefits. Whether the SBD fails to meet this requirement and differs materially from the terms of the plan the SBD is controlling. There is no allegation. There is nothing here where the SBD is inconsistent with the terms of the plan. The SBD is silent on the issue. And the SBD says on its face that it is a summary and that the terms of the plan will control. The actual language, this section is a summary plan description as required by ERISA. This section provides the highlights of the plan, but it is far shorter and less technical than the official plan documents. The official plan documents are always used to determine when and what benefits will be provided under the plan. And remember that in this instance, she was represented by counsel before the claims administrator. He did have access to the plan. There was nothing here that in any way amounted to a surprise. The Ninth Circuit continued, the omission of the plan language placing the determination in the discretion of Newmont does not undermine this conclusion. The plan's rules should be explained in the SBD to permit the ordinary employee to recognize that certain events or actions could trigger a loss of benefits. The provision at issue has no bearing on the events or actions determinative of eligibility under the plan. And the Court rejected the challenge that as a result, the arbitrary and capricious standard should not apply. Now, in this instance, let's look at the claim for disability. And let's look at the claim for disability based on a conclusion of interstitial cystitis, irritable bowel syndrome. Not one physician said that Ms. Carter was disabled due to this condition. Each said that she would need to take breaks. And that's what Judge Wilkin focused on, specifically her most recent treating physician, Dr. Alvarado. Dr. Alvarado said in response to counsel's letter that this condition is characterized by flare-ups and episodes of well-being. But during the flare-up episodes, patients do need to go to the bathroom more frequently. For that reason, we tend to request that these patients are given breaks on a relatively frequent basis. Dr. Alvarado's letter is found in the record at D00034. And so then what does this mean? It means that you can accommodate her condition. And that's what Dr. Weingarten found. And he found in terms of the physical limitations on her job, he checked off that accommodation would be needed. It's in Box No. 7. And said she will need to take frequent bathroom breaks, which is exactly what Dr. Alvarado said. Dr. Alvarado Now, the frequency of those were, I think, determined to be eight in an eight-hour shift. And the time that would be required would be 15 minutes per break. Dr. Alvarado It could be up to 15 minutes. Dr. Alvarado Up to 15 minutes. Dr. Alvarado It could be up to an hour each time. And I believe one of the doctors indicated that she might miss up to three days of work per month. Dr. Roberts As a result of or in addition to those. Dr. Alvarado In addition to. Now, let's look at what Dr. Weingarten's impressions were. His first one, remember that the terms of the plan are caused or contributed to by mental illness. Okay? Mood disorder, major depression, rule out bipolar depression. So the first basis is depression. And depression, there's no question, it fits within the ICD-9 codes. Number two, she's had a history of cervical cancer status post-total hysterectomy. Three, he questions the diagnosis of interstitial cystitis. He found that there was one chemical test that would suggest that it was present, and there were two other chemical tests that would have suggested that maybe it wasn't present. So he's questioning whether there was a diagnosis of interstitial cystitis. And then he continues. Probable psychophysiologic gastrointestinal reaction with somatization disorder secondary to major depression. Now, counsel said, well, somatiform pain disorder, it's not excluded by the plan. But counsel, even in his briefs, admitted that somatiform pain disorder is one of the disorders found in the Manual of Mental Disorders, and we pointed the Court to the ICD-9 codes within the 290 to 319 range that covered somatiform pain disorder. So it does meet it. It doesn't – the plan does not have and include everything from 290 to 319. In preparing for oral argument, I went on to the Center for Disease Control, and I printed out that section. It's 25 pages. The plan simply references it. It's supposed to be anything from 290 to 319, and the somatiform pain disorder fits within that category. Finally, Dr. Weingarten concludes, her major – her primary problem is major depression and mood disorder. Remember, if the total disability is caused or contributed to by mental illness, that's the language in the plan. She was not hospitalized. More recently, she has been diagnosed with irritable bowel syndrome with abdominal pains. Whether it is probably a manifestation of her psychiatric illness in that occasion that she might be taking for her psychiatric illness, SSRIs can cause diarrhea and abdominal pain. I grant that's not the world's best written sentence, but I had to read it verbatim. She also has a questionable diagnosis of interstitial cystitis, where I see very little of any objective findings in regard to this diagnosis. Again, her primary diagnosis is major depression with somatization chronic pain disorder. That's his conclusion. In other words, he felt that her irritable bowel syndrome may have been caused by the medication that she was taking for her depression. And then he concluded that she can return to work, but she would have to be given frequent breaks. And remember, the terms of the plan, the terms of the plan control, the total disability caused or contributed to by mental illness. If the medication that she was taking for her depressive disorder was causing the irritable bowel syndrome, that is a total disability contributed to by her mental illness. And not covered by the plan? It would only be covered by the plan if she had been hospitalized. Yes. And she had not been hospitalized. And remember that the illness, the cause, it doesn't matter whether it's social, psychological, genetic, physical, chemical, or biological if it falls within the designated areas. With that, the panel has any questions for me? I don't see any. Thank you for your argument, Rebuttal. Thank you, Your Honors. I do have a response, Your Honors. I keep hearing that the plan controls the plan, controls. And I really think that both Berg and Van Willis state that the plan does not control. And, of course, I've cited both of those cases in my briefs, Van Willis Reconstruction Labor Trust Funds, 2004 case, and Berkley Retired Plan for Pilots of Marqueer, 2002 case by the Circuit. Those cases are adamant, they're powerful, they're determinative cases that if there's a conflict between the SPD and the plan, the SPD controls. What does the SPD say about psychiatric illnesses? It doesn't say a disability caused or contributed to. It says results, if your disability is the result of a nervous or mental disorder. Not caused or contributed, it's the result of. Well, what's the difference between caused, something being the cause of something, something being the result of something? Patterson and Kunin deal with that. And they talk about when it says result, you're not looking at a combination of mental and physical ailments that could cause a disability. Patterson distinguishes the word result from caused or contributed. That's why I'm bringing it up. This court, the Ninth Circuit, in Patterson, dealt with that issue. And they concluded that it has to be a direct, result means direct result, that that's your ailment is the result of, not that it's caused or contributed. Now, that applies to the medications. That's really what that issue applies to. But let's even look at caused or contributed. Again, counsel talks about one of the two prongs in deciding what a mental illness is. What does the exclusion cover? It covers ailments that are listed in the American Psychiatric Association's DSM, Diagnostic Statistical Manual, and and, not or, and it has to have psychological or behavioral manifestations or impairment mental functioning. So the result of your psychiatric illness has to result, manifest itself in a psychological, behavioral, or mental functioning, not in stomach pain. And that was the Patterson case. The Court said in Patterson, whether the depression causes his pain or the pain causes the depression, if he has pain and the pain is disabling, unless the plan excludes a pain disorder, the pain disorder cannot be just dropped into a mental nervous. People don't expect it to be a mental nervous. And this plan is somewhat specific. It is detailed. And with that in mind, it's even more imperative that this Court hold them to what they've said. They've told the people that if you have a mental disorder that results in a behavioral manifestation or it results in a psychological manifestation or mental impairment, we're not going to cover it except for 52 weeks unless you're in a hospital. They don't say, if you've got pain throughout your body that's caused by an underlying psychological disorder, we're going to exclude it. They specifically detail what they excluded. It does not cover a pain disorder. I think Patterson is directly on point in this case. And Dr. Weingarten finds that she has the limitations. He attributes it to a mental pain disorder, which is not excluded. Dr. Snyder, and it's disingenuous to say that nobody says she can't work. First of all, Dr. Weingarten was specifically asked when he was written to by the plan, don't make a vocational assessment. We'll do that. So it's not fair to say that Weingarten didn't come in or whether she could work or not. He was told not to. The same thing goes with Dr. Snyder. He was sent pages 97, 98, 99, 100, and 101 of the original administrative record that was filed. Page 97 is a bladder problem residual functional capacity questionnaire. He goes through it, details the limitations that are on it that she has. How often is your patient's experience or symptoms severe enough to interfere with But she's going to be missing three days a month of work. She's going to be gone 15 minutes from her station an hour. He says she, you know, ability to sit, stand, and walk less than two hours, sit at one time, 15 to 30 minutes. He goes through and creates limitations that no right-minding person, including the judge below, could translate into a job. And to say that nobody has found that she can't work is disingenuous. Dr. Snyder answered all the questions asked of him and the limitations preclude her working. Dr. Weingarten was told don't make a vocational assessment. So why would he say whether she can or can't? But he did find her complaints of pain to be legitimate on either a result of medication or somatoform disorder. So he found that her pain was legitimate as well and found frequent bathroom breaks were required in any event. I think that Patterson and Kunin are very, very important in this case. And looking at what this plan says, this lady was post-cervical cancer. She's had treatment. She had a positive potassium chloride test. The other test didn't rule it out. You can have three or four tests to determine whether you have rheumatoid arthritis. You can have your blood tested for acetyl inflammation of joints. If one of those three things are there, that's evidence that you have it. If the other two are not there, it doesn't mean that's not evidence against having it. It's just less evidence corroborating. And there was no evidence in the record that Dr. Weingarten saw that he said, oh, if you don't have this positive finding, you don't have it. He just said she has this one positive finding, so that's evidence. We don't have a lot of evidence. He didn't find anything contradicting. So with that said, I think the record is overwhelming that she has these limitations. They preclude substantial gainful activity in any meaningful way, and that benefits should be granted. Thank you, counsel. Thank both counsel for their arguments. The Carter case will be submitted for decision. We'll proceed to the
judges: Canby, Thompson, Hawkins